[Cite as *State v. Carusone*, 2015-Ohio-4397.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-140737 |
| | | TRIAL NO. B-0606586 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| RALPH CARUSONE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  Affirmed

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher*, *William R. Gallagher* and *Elizabeth Conkin*, for Defendant-Appellant.

Please note:  we have removed this case from the accelerated calendar.

**CUNNINGHAM, Presiding Judge.**

{¶1}   Defendant-appellant Ralph Carusone appeals the Hamilton County Common Pleas Court's judgment overruling his Crim.R. 33 motion for a new trial. We affirm the court's judgment.

{¶2}   Carusone was convicted of felony murder in 2007. We affirmed his conviction in his direct appeal, and the Ohio Supreme Court declined to accept his appeal there. *State v. Carusone*, 1st Dist. Hamilton No. C-070653 (Dec. 10, 2008), *appeal not accepted*, 121 Ohio St.3d 1451, 2009-Ohio-1820, 904 N.E.2d 901.

{¶3}   In 2012, Carusone filed a motion seeking leave to move for a new trial. The common pleas court overruled the motion for leave. But on appeal, we reversed and remanded for a hearing on the motion. *State v. Carusone*, 1st Dist. Hamilton No. C-130003 (Nov. 15, 2013), *appeal not accepted*, 138 Ohio St.3d 1450, 2014-Ohio-1182, 5 N.E.3d 667. Following the hearing, the common pleas court granted leave to file a motion for a new trial, but overruled the new-trial motion. This appeal followed.

{¶4}   On appeal, Carusone advances four assignments of error that, read together, challenge the overruling of his new-trial motion. We find no merit to this challenge.

### The Standard of Review

{¶5}   Carusone sought a new trial under Crim.R. 33(A)(6), on the grounds that he was actually innocent of felony murder and had been denied a fair trial by the state's violation of its duty to disclose in discovery certain exculpatory evidence. The decision whether to grant a new trial on the ground of newly discovered evidence is discretionary with the trial court and will not be disturbed on appeal unless the court

abused its discretion. *State v. Williams*, 43 Ohio St.2d 88, 330 N.E.2d 891 (1975), paragraph two of the syllabus.

{¶6}　On a Crim.R. 33(A)(6) motion, the movant bears the burden of proving that the evidence is "newly discovered evidence," that is, that it was "discovered since the trial, [and] could not in the exercise of due diligence have been discovered before the trial." He must also prove that the evidence "is material to the issues, * * * is not merely cumulative to former evidence, and * * * does not merely impeach or contradict the former evidence." And he must prove that the evidence "discloses a strong probability that it will change the result if a new trial is granted." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶7}　But the guarantee of a fair trial secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution imposes upon the state a duty to disclose to a criminal accused evidence material to his guilt or innocence. *Brady v. Maryland*, 373 U.S. 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). When, as here, a new trial is sought under Crim.R. 33(A)(6) on the ground that the defendant had been denied a fair trial by the state's violation of its duty to disclose the newly discovered evidence, the relevant inquiry is not whether a trial with the undisclosed evidence would have yielded a different verdict, but whether the evidence, "considered collectively," "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 434-436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *accord State v. Johnston*, 39 Ohio St.3d 48, 60, 529 N.E.2d 898 (1988).

### The Trial

{¶8}　Carusone was charged with both purposeful murder and felony murder in connection with the death of Derek Rininger, following a physical

altercation between the two across the street from Rininger's house. Upon the evidence adduced at trial, the jury acquitted Carusone of purposeful murder, but found him guilty of felony murder, with felonious assault as the predicate offense. That evidence showed that Rininger had, a few days before the altercation, stolen from the apartment of the mother of his children, Jennifer Kron, $500 belonging to Kron's roommate, Melinda Scalf. At Rininger's invitation, Kron, with Carusone in the front passenger seat and Scalf in the back seat, drove to Rininger's house to recover the money. As Kron pulled up across from Rininger's house, Rininger ran from the house to the passenger side of Kron's car and took a swing at Carusone, either through the open car window before Carusone got out of the car (as Scalf testified) or as Carusone got out of the car (as Kron testified). Neither Kron nor Scalf saw a weapon, but both men were bloody after a brief exchange of blows. When Carusone retreated to the car, Rininger ran to the driver's side and reached through the open window for Kron's car keys. With Kron between them, Carusone and Rininger again struggled, until Kron put the car in gear and drove away.

{¶9} Rininger's next-door neighbor saw the two men struggling across the front seat of Kron's car, saw Kron drive away, and then saw Rininger run into and through to the back of his house, return to the front porch with a towel in his hands, and "jump[] off the side of the steps." A police officer and emergency medical personnel responded to Rininger's 911 call reporting that he had "just got stabbed." The police officer found Rininger next to the front porch, barely conscious, with a cell phone in one hand and a blood-soaked bath towel held to his abdomen with the other hand. A member of the emergency medical crew testified that he had observed "severe bleeding" from stab wounds to both the left inner arm and the chest, a weak pulse, and very shallow respirations, and that Rininger had not been responsive to

4

either verbal or painful stimuli. Rininger went into cardiac arrest in the ambulance on the way to the hospital, where efforts to resuscitate him proved futile.

{¶10} Meanwhile, Kron had driven Carusone to a friend's house. Jacob Carroll testified that he had been present when Carusone arrived, and that Carusone had appeared "distraught [and] wired," had burned his clothes, and had told Carroll, "I took care of business. I shanked him once." Carroll also testified that Carusone had, the night before, shown him a pocket knife with a six-inch blade that Carusone carried on his belt. At the hospital, a pocket knife bearing traces of Rininger's blood was recovered from the pocket of Rininger's bloody shorts.

{¶11} The deputy coroner testified that Rininger had stab wounds to his left inner arm and to the left side of his chest, and that he had blood in the pericardial sac, which the deputy coroner attributed to a "hole into the right side of the heart." The deputy coroner concluded that Rininger had "died as a result of a stab wound to the chest," administered with "[a] significant amount of force" to pass through the skin, the soft tissues of the chest, the cartilage of the lower rib cage, the pericardium, and then the heart.

{¶12} The toxicology report showed that Rininger had recently ingested alcohol, cocaine, marijuana, a tranquilizer, and an opiate analgesic. The defense presented at trial expert opinion testimony attributing Rininger's "turbulent" behavior to his recent ingestion of alcohol and drugs. But in the deputy coroner's opinion, those substances had not contributed to Rininger's death.

### The New-Trial Motion

{¶13} In support of his motion for a new trial, Carusone offered the evidence presented at the hearing on his motion for leave to move for a new trial and other "newly discovered evidence." This evidence, he argued, served to undermine the

credibility of the state's key witnesses and to discredit the evidence adduced at trial concerning the cause of death.

{¶14} *Credibility evidence.* Carusone supported his new-trial motion with "new evidence" in the form of an enhanced audio recording of Rininger's 911 call. The enhanced recording, Carusone asserted, showed that Rininger's brother had been present when the police officer found Rininger and, thus, undermined the credibility of Rininger's brother, who had testified at trial that he had arrived at the house after the ambulance had gone, and the credibility of the police officer, who had testified that when he found Rininger, no one else had been present who could have contaminated the crime scene.

{¶15} Carusone also offered newly discovered evidence concerning the competency of state's witness Jacob Carroll in the form of an affidavit made by a resident of the house where Carusone had been dropped off after his fight with Rininger. She averred that she, and not Carroll, had admitted Carusone to the house that night; that Carroll had not, as he had testified, been at the house when Carusone arrived; and that Carusone had been "upset crying" and had repeatedly said, "[H]e kept hitting me in the head." She also stated that she had made a taped statement to that effect when the police interviewed her. But her statement was not disclosed to the defense in discovery, and she was not called as a witness at Carusone's trial.

{¶16} Carroll testified at the hearing on the motion for leave that he could recall only "[b]its and pieces" of his trial testimony and the events to which he had testified, because he was a drug addict and had been, in those instances, under the influence of heroin. Carroll testified that he had seen Carusone in possession of a "small pocket knife," not a knife with a six-inch blade. And Carroll stated that he could not recall either hearing or testifying at trial to Carusone's alleged statement

after the altercation that he "took care of business" and "shank[ed]" someone. But Carroll could recall a conversation among Kron, Scalf, and Carusone before the altercation, indicating an intention to "fight" or "go get" Rininger.

{¶17} *Cause-of-death evidence.* Finally, Carusone offered newly discovered evidence concerning the cause of Rininger's death. This evidence was contained in the complete "run report" compiled by the emergency-medical personnel who had treated Rininger at the scene and on the way to the hospital; the complete report of Rininger's treatment at the hospital, including the report of the emergency-room physician who had treated Rininger; the opinion testimony of a pathology expert; and a news article that, Carusone insisted, showed that the deputy coroner had a "history of missing the cause of death due in part to not obtaining the [deceased's] full medical report."

{¶18} During discovery, the state had disclosed to the defense only the 8½- by 11-inch views of the two-page, 8½- by 14-inch emergency "run report" form. The disclosed portion of the run report, which indicated that Rininger had been bleeding only from his arm wound and had "flinched" in response to painful stimuli, contradicted the testimony of the emergency crew member presented at trial. In support of his new-trial motion, Carusone argued that the undisclosed portion of the report further undermined the emergency crew member's testimony, because it showed that he had neither treated nor transported Rininger.

{¶19} The state also disclosed in discovery only three of eight pages of the report detailing Rininger's treatment at the hospital. The disclosed pages of the report did not include the report made by the emergency-room physician. And the deputy coroner did not consider the emergency-room physician's report in reaching his opinion that Rininger had died as a consequence of a stab wound to the heart.

{¶20} Carusone's discovery of the emergency-room physician's report led him to pathology expert Thomas W. Young, M.D. Based on his review of the enhanced 911 call, the police reports, the hospital and emergency run reports, the toxicology and lab reports, and the trial testimony, Dr. Young concluded that the deputy coroner had been mistaken in the cause of death. According to Dr. Young, the deputy coroner's conclusion that Rininger had died from a stab wound to the heart did not "make any sense anatomically," because the medical records showed no damage to any organ between Rininger's chest wound and the wound to his heart. Also, Dr. Young asserted, blood loss from a stab wound to the heart would have rendered Rininger unconscious within a few minutes, thus precluding his run to and through his house. Moreover, Rininger was treated at the scene, in the ambulance, and at the hospital for bleeding from the wound to his arm and then for cardiac arrest; he was not treated for shock or for "anything [else] * * * involving a major vascular structure and blood loss." Finally, the injury to the heart that the deputy coroner had decided was a stab wound was, in Dr. Young's opinion, caused when a needle was inserted into the pericardial sac during pericardiocentesis, in an effort to resuscitate Rininger at the hospital.

{¶21} Dr. Young found that the evidence instead pointed to cardiac arrest as the cause of death. He heard in Rininger's 911 call "laborious[] * * * breathing," indicating "problems with heart function." Those problems were, in Dr. Young's opinion, "cause[d] * * * [by] the combined effects of multiple drugs and alcohol, and heavy stress and exertion. The two put together caused the heart to stop." Concerning the cause of Rininger's "stress," Dr. Young noted that the run report had "described * * * [n]o active bleeding * * * from the chest wound," and that the blood loss from the arm wound had not been so "significant" that it would have put Rininger into shock. But Dr. Young stated that "a person [can] basically collapse[] from a cardial arrest due to a

struggle [or] fear," that "stab wounds can add to the stress of the situation," and that "stress can in this setting with all of the other things combined affect heart function."

{¶22} Finally, Carusone supported his new-trial motion with his trial counsel's testimony at the hearing on leave. Counsel testified that the defense had essentially pursued only a self-defense strategy, and that, had they known of the matters contained in the undisclosed and other newly discovered evidence, they could have refuted the state's evidence concerning cause of death and could have more effectively challenged the credibility of the state's witnesses.

{¶23} *Denying a new trial was not an abuse of discretion.* Carusone sought a new trial on the grounds that the newly discovered evidence demonstrated that he is actually innocent of felony murder, and that he had been denied a fair trial by the state's violation of its duty to disclose that evidence in discovery. We cannot say that the common pleas court, in denying a new trial, abused its discretion.

{¶24} Carusone was charged with purposeful murder and felony murder, with felonious assault as the predicate offense. The purposeful-murder charge required proof that Carusone had "caus[ed]" Rininger's death "purposely," that is, that Carusone had acted with the "specific intention" of causing Rininger's death. *See* R.C. 2903.02(A) and 2901.22(A). The felony-murder charge required proof that Carusone had "caus[ed]" Rininger's death "as the proximate result of * * * committing or attempting to commit" felonious assault. *See* R.C. 2903.02(B). The felonious-assault charge required proof that Carusone had acted not purposely, but "knowingly," that is, with an "aware[ness]" that his conduct would "probably cause" the proscribed result, *see* R.C. 2901.22(B), and that he had either "caus[ed] serious physical harm to" Rininger, or had "caus[ed] or attempt[ed] to cause physical harm

to [him] * * * by means of a deadly weapon," that is, an "instrument capable of inflicting death" that was, in that instance, "use[d] as a weapon." *See* R.C. 2903.11 and 2923.11.

{¶25} By its verdicts finding Carusone not guilty of purposeful murder, but guilty of felony murder, the jury effectively found that he had caused Rininger's death, but had not intended to kill him. The verdicts indicated a determination by the jury that Rininger's death had been the proximate result of Carusone either engaging in conduct that caused serious physical harm to Rininger, with an awareness that his conduct would probably cause serious physical harm, or using a deadly weapon to cause or attempt to cause Rininger physical harm, with an awareness that his use of that weapon would probably cause physical harm.

{¶26} The undisclosed and other newly discovered evidence offered in support of Carusone's motion for a new trial plainly discredits the deputy coroner's opinion testimony that the cause of Rininger's death was a stab wound to the heart. But that evidence and the evidence adduced at trial would also support findings that Carusone had gone to Rininger's house to fight him; that during the fight, Carusone had stabbed Rininger in the chest and arm with a pocket knife; that that knife, even without a six-inch blade, had, by its nature and use, constituted a deadly weapon; that the bleeding from Rininger's arm wound, while insufficient to cause death or shock, had been serious enough to require emergency-medical treatment; that the stab wounds to the chest and arm, sustained in the course of the struggle between Carusone and Rininger, had, in the words of Dr. Young, "add[ed] to the stress of the situation"; and that that "heavy stress and exertion," along with "the combined effects of multiple drugs and alcohol, * * * [had] together caused [Rininger's] heart to stop."

{¶27} Thus, the evidence not disclosed in discovery and the other newly discovered evidence offered in support of the new-trial motion, considered collectively and with the evidence adduced at trial, would support a finding, beyond a reasonable doubt, that Carusone had caused Rininger's death as the proximate result of either knowingly causing him serious physical harm or knowingly causing or attempting to cause him physical harm by means of a deadly weapon. It follows that Carusone failed to demonstrate his claim that he was innocent of the crime of felony murder. And because the undisclosed evidence could not be said to have been "material" in the sense that it might reasonably be said to undermine confidence in the jury's verdict finding him guilty of felony murder, Carusone failed to demonstrate that he had been denied a fair trial.

### *The Judgment is Affirmed*

{¶28} We, therefore, hold that the common pleas court properly denied Carusone a new trial. Accordingly, we overrule the assignments of error and affirm the court's judgment.

Judgment affirmed.

**DEWINE** and **STAUTBERG, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.