[Cite as *State v. Hill*, 2019-Ohio-365.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180114 |
| | | TRIAL NO. B-9103654 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| GENESIS HILL, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part and Reversed in Part, and Cause
Remanded

Date of Judgment Entry on Appeal: February 6, 2019

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman*, Chief Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher* and *William Gallagher*, for Defendant-Appellant.

Per Curiam.

{¶1} Defendant-appellant Genesis Hill appeals the Hamilton County Common Pleas Court's judgment overruling his Crim.R. 33 motion for a new trial. We reverse the judgment in part upon our determination that the court abused its discretion in overruling the motion without first conducting an evidentiary hearing on the *Brady* and actual-innocence claims presented in the motion.

{¶2} In 1991, Hill was convicted upon jury verdicts finding him guilty of aggravated burglary in violation of R.C. 2911.11, kidnapping in violation of R.C. 2905.01, and two counts of aggravated murder in violation of R.C. 2903.01. The aggravated-murder charges were accompanied by death-penalty specifications charging that the offenses had been committed during an aggravated burglary and during a kidnapping. For the aggravated murders, the trial court imposed death sentences.

{¶3} Hill's convictions were affirmed on direct appeal. *State v. Hill*, 1st Dist. Hamilton Nos. C-910916 and C-940487, 1994 WL 721580 (Dec. 21, 1994), *aff'd*, 75 Ohio St.3d 195, 661 N.E.2d 1068 (1996), *cert. denied*, 519 U.S. 895, 117 S.Ct. 241, 136 L.Ed.2d 170 (1996). In postconviction petitions filed in 1996, 2000, and 2009, he unsuccessfully challenged his convictions on grounds unrelated to his new-trial grounds. *State v. Hill*, 1st Dist. Hamilton No. C-100554, 2011 WL 3477183 (Aug. 10, 2011), *appeals not accepted*, 132 Ohio St.3d 1513, 2012-Ohio-4021, 974 N.E.2d 112; *State v. Hill*, 1st Dist. Hamilton No. C-030384 (Dec. 21, 2003), *appeals not allowed*, 102 Ohio St.3d 1448, 2004-Ohio-2263, 808 N.E.2d 398; *State v. Hill*, 1st Dist. Hamilton No. C-961052, 1997 WL 727587 (Nov. 21, 1997), *appeal not allowed*, 81 Ohio St.3d 1468, 690 N.E.2d 1288 (1998). And in 2016, he was denied the relief

sought in his 1998 petition for a writ of habeas corpus. *See Hill v. Mitchell*, 842 F.3d 910, 918 (6th Cir.2016), *cert. denied,* 138 S.Ct. 82 (2017).

{¶4}   In 2017, Hill moved for leave to file a motion for a new trial on the grounds of prosecutorial misconduct, actual innocence, and ineffective assistance of trial counsel, based on allegedly impeaching and exculpatory newly discovered evidence and evidence not disclosed in discovery.  The common pleas court granted leave, considered Hill's proposed new-trial motion on its merits, and upon the motion and the state's response, overruled the motion.

{¶5}   In this appeal, Hill advances a single assignment of error challenging the overruling of his new-trial motion without an evidentiary hearing. The challenge is well taken in part.

### The Trial

{¶6}   The charges against Hill arose in connection with the death of Domika Dudley, the six-month-old daughter of Hill and Teresa Dudley.  Domika resided with Dudley and her family in the city of Cincinnati.  Although Hill and Dudley had an on-going relationship, Hill resided separately from Dudley and Domika, in a house down the street.  On June 1, 1991, just past midnight, Dudley woke up to find Domika missing from her home.  On June 2, police found her body in a vacant lot behind Hill's house.

{¶7}   *Guilt-phase evidence.*   During the guilt phase of Hill's trial, Dudley's neighbors testified that in the days leading up to Domika's death, they had overheard Hill arguing with Dudley about child support.   Dudley's friend and neighbor, Barbara Janson, testified that during that argument, she had heard Hill declare that he would "kill that little bitch before he paid anything."  *Hill*, 75 Ohio St.3d at 196, 661 N.E.2d 1068.  Dudley, on cross-examination, confirmed that Hill

3

had resisted the idea of paying child support, and she asserted that Hill "didn't really like" Domika. But Dudley denied that Hill had "ever threaten[ed]," or "even suggested," that he would "hurt [Domika] like that."

{¶8} On the afternoon of May 31, Hill and Dudley were again seen arguing in Hill's yard. That night, Dudley put Domika to bed and, leaving the hallway light on, retired to another room. The only access to Dudley's apartment was through her building's front entrance; the building's back yard was surrounded by an eight-to-nine-foot wall. Between 11:00 p.m. and midnight, neighbors saw Hill enter, but not exit, through the building's front entrance. Shortly after midnight, Dudley awoke to discover the light bulb in the hallway fixture unscrewed and Domika missing.

{¶9} Dudley went to Hill's home to ask about Domika. Hill was not there, but appeared shortly thereafter. He denied knowing where Domika was and did not participate in a neighborhood search for her conducted by the police. To those present, Hill appeared unconcerned about Domika's absence, and he was "snickering" and "grinning" as Dudley talked to the police. *Id.*

{¶10} The search continued. On June 1, at around 5:45 a.m., Dudley, in the company of Hill's aunt, found on the floor of Hill's garage a barrette that was "identical" to a barrette that Dudley had placed in Domika's hair before putting her to bed. *Id.*

{¶11} On the afternoon of June 2, police found Domika's body in the overgrown vacant lot behind Hill's garage. She had not been there on June 1, when police first searched the lot. She was found in an SMA® baby-formula box, wrapped in a plastic shopping bag, three plastic trash bags, and black electrical tape. Her head was also wrapped in a man's shirt that Dudley and Janson told police "look[ed]

4

like" a shirt that Hill owned. *Id.* She was wearing only a diaper, and she had two barrettes in her hair.

{¶12} Hill resided with his aunt and uncle. The baby-formula box in which Domika was found was similar to one that Hill's aunt had placed in a trash pile next to their garage. The box bore batch numbers matching an SMA® can from his aunt's pantry, and it had been in the trash pile on June 1, but not on June 2. His uncle was unable to find black electrical tape that he kept in a tool box at his home. The last trash bag wrapped around Domika had, in the opinion of a forensics expert, previously been directly attached to a trash bag found in the kitchen in Hill's apartment. And the police found Hill's right thumb print on the lightbulb in the hallway light fixture near where Dudley and Domika had slept at their home.

{¶13} The autopsy performed by Dr. Amy Martin revealed that "Domika died as a result of three skull fractures, and she had been dead for more than twelve hours. Either a strong, blunt force had struck her head, or her head had been crushed. She might have been injured in a fall, but it seems only if another force had hit her during or after the fall." *Id.*

{¶14} The state also presented the testimony of a Cincinnati bus driver who, while driving his route on the evening of June 2, overheard a crying, upset young man say to another man that "he could not believe what he had done to a little baby," and that "he thought he might get the chair for it." *Id.* at 197. The driver contacted the police the next day, after he heard a news report about Domika's death. The driver identified Hill in a photo array as the man who had been crying on the bus, but could not identify him at trial. The driver stated that he had just caught "a quick glance as [the man] was leaving the bus," that he had selected Hill's photo from the array "more based on a size and a height than * * * distinguishable characteristics,"

5

and that "[i]f an officer had not said that I had picked that one out, I may not have had any faith that I picked out the correct one."

{¶15} The defense presented testimony by Hill and his friends and relatives concerning the events of May 31. Defense witnesses asserted that Dudley had not been a good mother and had been aggressive toward Hill during their argument that afternoon. The witnesses stated that there had been only two trash bags in Hill's kitchen, and that Dudley had had access to the bags. And they suggested that she might have "planted" the barrette in Hill's garage. *Id*.

{¶16} Finally, Hill, in his narrative testimony, admitted that he had, at around 11:00 p.m. on May 31, been in the hallway outside Dudley's door and unscrewed the light bulb. He said that he had "whistled" at Dudley's bedroom door, but when she did not respond, he had left the building as he had entered it, through the front entrance, and had returned to "the business" of drinking with his friends. *Id.* With his testimony, the Ohio Supreme Court concluded, Hill had "implicitly denied taking Domika, but he did not explicitly do so," and the state's "[c]ross-examination had revealed discrepancies between his testimony and his statements to police and two mental health professionals." *Id.*

{¶17} The jury returned verdicts finding Hill guilty of aggravated burglary, kidnapping, and aggravated murder, along with the death-penalty specifications.

{¶18} *Penalty-phase evidence.* Evidence adduced during the penalty phase of Hill's trial revealed that Hill had been born on June 7, 1971, to a mother who suffered from serious depression and chronic emotional problems and a father who had spent time in prison and contributed little to Hill's support or upbringing. Hill's family was very poor, and he grew up in an extremely poor and drug-infested neighborhood, with a lot of "negative influences" and "temptations." *Id.* at 197-198.

{¶19} In opening statements during the penalty phase, defense counsel conceded that Hill had a juvenile record for arson, burglary, resisting arrest, and tampering with a coin machine. The defense also presented testimony by family members to Hill's prior involvement with gangs and experience with drug-trafficking to support himself, "to have things," and "to survive." *Id.* at 198.

{¶20} Hill had always struggled academically, and he left school after the eighth grade. He started using drugs and alcohol at 14. At 16, he had "problems with serious depression, and wrote suicide notes." *Id.* At 17, a psychiatric evaluation found that he suffered from "major depression with psychotic features" and had experienced auditory hallucinations. *Id.* But a psychologist who evaluated Hill in June 1991 found that he was "of average intelligence with the capacity to develop job skills and educate himself," and that he was "rational and intelligent, had no mental disease or defect, and was not suffering from major depression." *Id.*

{¶21} Family members also testified concerning Hill's character, describing him as "kind," "sweet," "gentle," "loving, caring," helpful, and a "good," "very nice," and "very outgoing" person, who "treats people very well." *Id.* at 197-198. Others described the difficult environment in which he had been raised and expressed their love and understanding for him. His juvenile case worker described him as "likable" and "respectable," although easily "intimidated." *Id.*

{¶22} In his unsworn statement, Hill again neither admitted nor denied killing Domika. He said, "I feel hurt. Growing up was hard. A lot of things wasn't right for me," and "[I] struggled to survive." And he stated that he was "sorry that you all have to be here," "sorry that the baby [was] gone," and "sorry for the family." *Id.* at 198.

{¶23} At the sentencing hearing conducted after the jury had recommended the death penalty, Hill told the court that he was "sorry you have to judge me. * * * [I] just hope and pray that you can spare my life." *Id.* Hill's juvenile probation officer also spoke on his behalf. Although Hill had asked her not to, the probation officer told the court that Hill had told her that he "did not brutally nor intentionally kill that baby," and that "it was an accident." *Id.*

{¶24} The trial court, upon the jury's recommendation, imposed for the aggravated murders sentences of death.

### *The Direct Appeal*

{¶25} In affirming Hill's convictions in the direct appeal, the Ohio Supreme Court characterized the evidence of guilt as "compelling" and concluded that the evidence "adequately proved Hill's guilt" of the offenses. *Id.* at 212, 205. Relevant to the matters presented by Hill's new-trial motion, the court determined that the evidence supported the jury's finding that Hill had killed Domika:

> Two witnesses identified Hill as entering Teresa's yard within fifteen minutes of Domika's disappearance. They did not see him leave. Hill admitted he was there, and his thumbprint on the unlit hall light bulb confirmed this. Domika's body was found in a vacant lot behind his garage. Hill's shirt and trash bags from his apartment were wrapped around her body. She had been stuffed in a carton, which had been earlier discarded near Hill's garage. Her barrette was found on Hill's garage floor. Finally, a disinterested bus driver reported that, on the day Domika was found dead, Hill said that he would "get the chair" for what he had done to a baby.

*Id.* at 205.

{¶26} The court also specifically rejected Hill's argument, in support of his challenge to the legal sufficiency of the evidence, that "no proof exists that he purposefully killed Domika." *Id.* at 206. The court concluded that the jury could reasonably have found that Hill had acted purposefully based on the evidence presented at trial concerning "Domika's injuries and Hill's declared intentions":

> Domika died as a result of multiple blunt force or blunt impacts to her head. Her three skull fractures could not have been caused by a simple fall. Violent shaking, in addition to blunt trauma, may have contributed to her death, but the coroner concluded Domika died as a result of homicide, not accident. Hill had vowed never to pay child support and to "kill that little bitch" first.

*Id.*

{¶27} The court's independent sentence evaluation led it to conclude that Hill's death sentences were appropriate. The court accorded some weight to Hill's history and background. Of the R.C. 2929.04(B)(1) through (6) mitigating factors, the court found only Hill's youth applicable, *see* R.C. 2929.04(B)(4), and neither discussed nor accorded weight to the degree of Hill's participation in the offenses or in the acts that led to Domika's death. *See* R.C. 2929.04(B)(6). The court also considered, but gave no weight to other factors contemplated by R.C. 2929.04(B)(7), including remorse, mental problems, and residual doubt. *Id.* at 213-214.

### The Habeas Corpus Petition

{¶28} Beginning in 1998, Hill also sought relief from his convictions by filing with the United States District Court for the Southern District of Ohio a petition for a writ of habeas corpus. The petition, as originally conceived and as subsequently amended, sought relief on grounds including prosecutorial misconduct in failing to

9

disclose favorable evidence in discovery, in violation of the fair-trial guarantee of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the United States Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 87, 83 S.Ct. 1194, 10 L.Ed.2d 104 (1972). In 2006, the district court denied the petition. *Hill v. Mitchell*, S.D.Ohio No. 1:98-cv-452, 2006 WL 2807017 (Sept. 27, 2006).

{¶29} In December 2007, pursuant to a public-records request, Hill discovered a police report that had been prepared by the first police officer to respond on the night Domika went missing, but had not been provided in discovery. In September 2010, the district court compelled the state to disclose all documents contained in the "prosecutor's file." *Hill v. Mitchell*, S.D.Ohio No. 1:98-CV-452, 2010 WL 3894202, *10 (Sept. 30, 2010). In 2011, Hill moved for reconsideration of the court's finding that his *Brady* claim had been procedurally defaulted and for a finding that the police report established cause and prejudice to excuse the procedural bar. In 2012, the district court granted reconsideration.

{¶30} Hill also moved to expand the record to include a transcript of Dudley's grand jury testimony, which the state had disclosed in October 2010. The district court granted expansion of the record to include Dudley's grand jury testimony as further evidence in support of Hill's *Brady* claim. *Hill v. Mitchell*, S.D. Ohio No. 1:98-cv-452, 2013 WL 1345831 (Mar. 29, 2013).

{¶31} Hill did not request, and the district court did not conduct, an evidentiary hearing on Hill's habeas petition. In March 2013, the district court granted a conditional writ of habeas corpus based upon the state's failure to disclose the police report and directed the state to either release Hill or grant him a new trial.

{¶32} In December 2016, the United States Court of Appeals for the Sixth Circuit reversed the district court's decision and remanded for entry of an order

denying Hill's petition. *Hill*, 842 F.3d 910. In its decision, the Sixth Circuit split on the dispositive question whether Hill's *Brady* claim was time-barred. The Sixth Circuit held that the district court had abused its discretion in reconsidering and amending the claim, when the claim was time-barred under the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. 2254(d), because Hill had failed to bring the new evidence to the district court's attention within one year from its discovery. Judge McKeague authored the lead opinion filed in the case, and Judge Batchelder concurred in its holding. Chief Judge Cole dissented. *Hill*, 842 F.3d at 925-926 (McKeague, J.), 948-950 (Batchelder, J., concurring), and 956-959 (Cole, C.J., dissenting).

{¶33} The panel also split on the question whether Hill's *Brady* claim, if timely presented, would have succeeded on the merits. All agreed that the state, in failing to disclose in discovery the police report and Dudley's grand jury testimony, had "suppressed * * * potentially * * * favorable" evidence, at least in terms of impeaching Dudley's credibility. *See id.* at 926 and 933 (McKeague, J.) and 952 (Cole, C.J., dissenting). But Judge McKeague concluded that *Brady*'s materiality standard was not satisfied by the "ambiguous comments in the police report" or by testimony by Dudley to the grand jury "that was not precisely consistent with her trial testimony." In his assessment, the undisclosed evidence itself was "of marginal, speculative significance." And because the district court had failed to conduct an evidentiary hearing, the value of that evidence remained "speculative," whether for purposes of impeaching Dudley's credibility or leading to other evidence that was sufficiently exculpatory or impeaching as to undermine confidence in the trial's outcome. *Id.* at 927-928 (McKeague, J.).

11

{¶34} Judge Batchelder and Chief Judge Cole concluded to the contrary. Judge Batchelder, in her concurring opinion, simply stated her "belie[f] [that] the withheld police report satisfies the [*Brady*] standard for materiality of impeachment evidence." *Id.* at 948 (Batchelder, J., concurring). Chief Judge Cole, in his dissent, concluded that both the police report and the grand jury testimony met the materiality standard, upon consideration of the "cumulative effect" of the withheld evidence and application of the United States Supreme Court's most recent statement of the standard. *Id.* at 951-952, quoting *Kyles v. Whitley*, 514 U.S. 419, 421, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), and citing *Wearry v. Cain*, 565 U.S. 73, 136 S.Ct. 1002, 1006, 194 L.Ed.2d 78 (2016) (holding that "[e]vidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury"). In his assessment, the police report, which, "in no roundabout way, suggests that Dudley was a potential suspect in the state's murder investigation," and the grand jury testimony, which "shows that the discovery of Domika's barrette, a critical event, was uncertain in Dudley's mind," were "material because they build up Hill's defense, provide a compelling means to undermine the state's most powerful witness, and thus call into question the reliability of the jury's verdict * * * [because] the state's remaining circumstantial evidence is not 'strong enough to sustain confidence' in [that] verdict." *Id.* at 954-955, quoting *Smith v. Cain*, ___ U.S. ___, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012).

{¶35} Hill appealed the Sixth Circuit's decision to the United States Supreme Court. The Supreme Court denied certiorari. *Hill v. Mitchell*, 138 S.Ct. 82, 199 L.Ed.2d 53 (2017).

### The New-Trial Motion

{¶36} Four months after the Sixth Circuit's decision, Hill sought, and was granted, leave by the common pleas court to move for a new trial. In his new-trial motion, Hill sought a new guilt-phase and/or penalty-phase trial under Crim.R. 33(A)(2) and (A)(6), based not just on the *Brady* material that had been the subject of his habeas proceeding, but also on newly discovered evidence. Specifically, he alleged that he had been denied a fair trial by prosecutorial misconduct in withholding from the defense the police report and Dudley's grand jury testimony, and that that wrongfully withheld evidence, along with other newly discovered evidence contained in a 2016 affidavit made by Dr. Amy Martin concerning the manner of Domika's death and the 2011 affidavits of Mesha Daniels and Alexis Davenport implicating Dudley in disposing of Domika's body, demonstrated his actual innocence of aggravated murder and his trial counsel's ineffectiveness in presenting his defense.

{¶37} In this appeal, Hill contends that the common pleas court abused its discretion in overruling his new-trial motion and in declining to conduct an evidentiary hearing on the motion. In defense of the court's judgment overruling the motion, the state argues that res judicata barred Hill's *Brady* claim, that his new-trial grounds were not timely asserted, and that the motion did not satisfy the standards for a new trial.

### Res Judicata Inapplicable.

{¶38} The state asserts that under the doctrine of res judicata, the Sixth Circuit's decision in Hill's habeas corpus case operated to bar the *Brady* claim presented in his new-trial motion. We disagree.

{¶39} The Sixth Circuit denied Hill habeas relief based not upon the merits of his *Brady* claim, but upon his failure to timely assert the claim. And while two of the

three opinions filed with the decision included lengthy discussions concerning the merits of the claim, two of the three judges who decided the case concluded that the claim, had it been timely asserted, would have succeeded on the merits. Accordingly, no aspect of the related doctrines of res judicata, issue preclusion, or law of the case could be said to apply to preclude the common pleas court from considering on the merits, or granting relief, based on the *Brady* claim presented by Hill in his new-trial motion.

### *New-Trial Grounds Not Time-Barred*

{¶40} The state also argues in defense of the judgment overruling the new-trial motion that the grounds for relief presented in the motion were time-barred under Crim.R. 33(B). App.R. 3(C) precludes the state from advancing this argument in this appeal.

{¶41} A Crim.R. 33(A)(6) motion for a new trial on the ground of newly discovered evidence must be filed either within 120 days of the return of the verdict or within seven days after leave to file a new-trial motion has been granted, and leave may be granted only upon "clear and convincing proof that the defendant [had been] unavoidably prevented from [timely] discovering the evidence." A motion for a new trial on other grounds must be filed either within 14 days of the return of the verdict or within seven days after the granting of leave, and leave may be granted only upon "clear and convincing proof that the defendant [had been] unavoidably prevented from [timely] filing [his new-trial] motion." Crim.R. 33(B).

{¶42} The common pleas court granted Hill leave under Crim.R. 33(B) to move for a new trial under Crim.R. 33(A)(2) and (A)(6). Implicit in that judgment was the court's determination that Hill had satisfied Crim.R. 33(B) by providing clear and convincing proof that he had been unavoidably prevented from timely discovering the

evidence upon which his newly-discovered-evidence claims depended and unavoidably prevented from timely moving for a new trial based on his prosecutorial-misconduct claim. The court then considered and entered a final judgment overruling Hill's new-trial motion "on the merits."

{¶43} From that judgment, Hill filed this appeal. The state did not cross-appeal, but nevertheless, in defense of that judgment, assails the court's determination in granting leave, that the new-trial motion was timely filed under Crim.R. 33(B).

{¶44} App.R. 3(C) provides,

(1) Cross Appeal Required. A person who intends to defend a judgment or order against an appeal taken by an appellant and who also seeks to change the judgment or order or, in the event the judgment or order may be reversed or modified, an interlocutory ruling merged into the judgment or order, shall file a notice of cross appeal within the time allowed by App.R. 4.

(2) Cross Appeal and Cross-Assignment of Error Not Required. A person who intends to defend a judgment or order appealed by an appellant on a ground other than that relied on by the trial court but who does not seek to change the judgment or order is not required to file a notice of cross appeal or to raise a cross-assignment of error.

{¶45} An "interlocutory order" is defined as "[a]n order that relates to some intermediate matter in the case; any order other than a final order." *Black's Law Dictionary* (10th Ed.2014), order. The principle underlying App.R. 3(C)(1) is that all interlocutory orders are "merged" into the final judgment or order entered in the case, and thus "a party cannot accept a final judgment or order and at the same time attack

an interlocutory ruling merged into it." 1992 Staff Note, App.R. 3. As the United States Supreme Court explained in *Greenlaw v. United States,* 554 U.S. 237, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008), "[t]he cross-appeal rule * * * is both informed by, and illustrative of, the party presentation principle," under which "an appellate court may not alter a judgment to benefit a nonappealing party." *Id.* at 245-246.

{¶46} The common pleas court's order granting Hill leave under Crim.R. 33(B) to move for a new trial constituted an interlocutory order. That interlocutory order was adverse to the state, and it merged into the court's final, appealable order overruling the new-trial motion "on the merits." In this appeal, the state defends the overruling of the new-trial motion by seeking to change the court's adverse interlocutory ruling granting leave. App.R. 3(C) requires that change to be sought in a timely-filed cross-appeal. Because the state did not file a cross-appeal, the common pleas court's determination in granting leave—that the new-trial claims were timely asserted under Crim.R. 33(B)—is unassailable in this appeal. And our review is confined to the court's judgment overruling the new-trial motion on the merits. *See, e.g., State v. Dibble*, 2017-Ohio-9321, 92 N.E.3d 893 (10th Dist.), *appeal allowed*, 153 Ohio St.3d 1432, 2018-Ohio-2639, 101 N.E.3d 464, ¶ 19-24 (appeal allowed on an unrelated proposition of law); *State v. Oke*, 6th Dist. Wood No. WD-04-083, 2005-Ohio-6525, ¶ 54 (holding in appeals challenging the overruling of motions to suppress, that App.R. 3(C)(1) required the state to cross-appeal to challenge the trial court's interlocutory findings of probable cause and standing).

### *Evidentiary Hearing Warranted*

{¶47} We conclude that the common pleas court abused its discretion in declining to conduct an evidentiary hearing on the *Brady* and actual-innocence

grounds presented in Hill's new-trial motion. For that reason, we reverse the court's judgment overruling the motion.

{¶48} The theory of the state's case against Hill was that he had broken into Dudley's home, kidnapped Domika, and murdered her to avoid paying child support. The evidence of Hill's culpability in Domika's death was largely circumstantial. Dudley's testimony at trial was critical to proving the alleged criminal acts and motive.

{¶49} The defense at trial focused almost entirely on undermining Dudley's credibility by suggesting that she had been responsible for Domika's death and that she had lied to divert law enforcement's attention from herself to Hill. *See Hill*, 75 Ohio St.3d at 197, 661 N.E.2d 1068 (noting that "[a]t trial, numerous * * * [d]efense witnesses suggested * * * that [Dudley] was not a good mother; that she had been aggressive towards Hill on May 31; that she had access to the trash bags in Hill's kitchen; and that she may have 'planted' the barrette on the garage floor.").

{¶50} *The police report.* In support of his new-trial motion, Hill offered the "Cincinnati Police Preliminary Investigation Report" prepared by the first police officer on the scene after Dudley had called to report Domika missing. The officer testified at trial that around 12:15 a.m. on June 1, he had arrived at Dudley's house in response to a dispatch concerning "family trouble" and found Dudley and her mother "on the ground crying." When Dudley told him that "her baby was missing," he and another officer searched Dudley's house and the area, including the alley, behind her house. At Dudley's urging, the officers went to Hill's house and spoke with his family and then with him. He denied taking Domika or being at Dudley's house that night, and he acted "[n]onchalant, like" and "[un]concerned" about her disappearance.

With Hill's consent, the officers searched Hill's bedroom for, and there found under a pile of clothes, the T-shirt and shorts that "witnesses said he had changed from."

{¶51} The next morning, the officer prepared his report. In describing the search conducted and the physical evidence located, references to Hill as "the suspect" had been crossed out and "the father" substituted. And the officer indicated that a "suspect" could not "be identified" because "[n]o one saw the father with the baby." In response to the question whether persons interviewed needed to be "re-contact[ed]," the officer directed investigators to "[f]ollow up" with the neighbors who had seen Hill enter Dudley's building, "on [the] question [of] how much time the mother spends with the child and how many different people does she let watch her." In response to the question, "Do you believe that this case could be solved with some additional investigative time?" the officer circled "YES" and wrote, "Investigate why the mother ran from police and asked for the police to check the alley behind the house (several times)." The report also included these additional comments:

> Received radio run regarding family trouble. When we arrived Mother and Grandmother were lying on ground crying. The mother then told us she thinks the father took the baby. We searched the house and surrounding area. Notified Lieutenant, we then went to father's house. Gave consent to search. During search found nothing. Notified CIS[,] they responded and had the Mother, Grandmother, and father come down for Question[.] CIS interviewed the above.
>
> The father[']s sister * * * states the mother is very irresponsible and was with her family most of the day without the baby.

{¶52} *Dudley's grand jury testimony.* Hill also supported his new-trial motion with Dudley's grand jury testimony concerning her discovery of Domika's barrette on the floor of Hill's garage.

{¶53} Before the grand jury, Dudley testified that she had placed three barrettes in Domika's hair, and that in searching for Domika, "we went down there that morning, me, Denise and Ranisha," and "[t]hey started looking in the garage and I was standing outside the garage. And I looked down. There was a barrette right there * * * I was like, there, that is her barrette right there. Ranisha looked up, picked it up and gave it to me." Dudley explained, "Ranisha's last name * * * [is] Hill. That is his cousin."

{¶54} At trial, Dudley testified,

Me, Barbie, and Pam * * * went down [to Hill's house], and Ruby was standing outside, and Denise. Then Denise give me a shirt and I set down there. And they say, "We help [you] look for her, if you want [us] to." Denise and Ronessa, they had helped me look for her that night. * * * [W]e started looking in the garages. And I went down and her barrette was right there and I found it. They say, "You sure this is your baby barrette?" And I was like, "Yeah."

Dudley then went on to confirm that she had "found a barrette in the garage at [Hill]'s house that morning," "just sitting there," and that that barrette had been in "[Domika's] hair when she was asleep with [Dudley] that night," after Dudley "had did her hair earlier." On cross-examination, she specified that she had spotted the barrette "in the opening" of the "halfway open" garage.

{¶55} Dudley's neighbor Pamela Lewis testified for the state at trial. She did not claim to be present for the search of the garage. Hill's aunt Denise Hill and her

daughter Ronessa Hill testified for the defense at trial. They stated that they had helped Dudley look for Domika and had been present in the garage when the barrette was found.

{¶56} *Affidavits of Davenport and Daniels.* Hill additionally supported his actual-innocence and ineffective-counsel claims with other newly discovered evidence contained in the affidavits of Alexis Davenport and her daughter Mesha Daniels. Davenport and Daniels stated that they were not acquainted with Hill or his family. They lived across the street from Dudley and her family in 1991, and they observed from their porch events that transpired there on the day before Domika was found. Davenport and Daniels declared that if they had been called to testify at Hill's trial, they would have testified consistent with the averments of their affidavits.

{¶57} In her affidavit, Daniels averred,

Around the time when the baby was missing, I witnessed [Dudley] and Barbara Janson, her next door neighbor and best friend, * * * carrying a brown Similac box down the street. Each of them held one side of the box. They were walking on their side of the road in the direction of Mulberry Street [where Hill lived].

After [Dudley and Janson] walked down the road, [Dudley's] mother, Debra Dudley, came outside her house and was screaming and sobbing very loud. I remember her saying, "I can't believe she did that to my baby." [Dudley's mother] was hysterical and laying next to the driveway. [Dudley's] brother came outside and walked [their mother] back inside.

I saw [Dudley and Janson] walk back up the road * * *. They were no longer carrying the box.

{¶58} In her affidavit, Davenport echoed the opinions of others that Dudley's care for Domika had been "poor," and that Domika bore the physical signs of that care. According to Davenport, when she scolded Dudley about the care given Domika and offered to take the child, Dudley said, "[G]o ahead." Concerning the day before Domika was found, Davenport averred,

> Although I don't remember exactly when, I do recall [Dudley's] mother, Debra Dudley, came outside her house and was screaming and sobbing very loud. I remember her saying, "I can't believe she did that to my baby." [Dudley's mother] was hysterical and was talking out loud to herself. [Dudley's] brother came outside and walked [her] back inside.

> Five to ten minutes [later], [Dudley] walked out of the house with Barbara Janson, her close friend and next door neighbor. Unlike Debra Dudley, [Dudley and Janson] were both very calm.

> I also noticed that [Dudley and Janson] were carrying a brown Similac box down the street. Each of them held one side of the box. They were walking on my side of the road in the direction of Mulberry Street.

> After [Dudley and Janson] were out of sight, [Dudley's mother] came outside again and was crying. I heard her scream "my baby is gone."

> Around 15 minutes [after they left with the box], [Dudley and Janson] walked back up the road * * *. They were no longer carrying the box that I had seen them carry before. * * * [They] separated and went into their own homes.

A few minutes later, * * * I was sitting on my front porch and [Janson] walked up, alone, to talk. [Janson] told me that Domika * * * was dead. [Janson] was not sad or hysterical at all. Her demeanor was like she felt like it was important to tell somebody this news. I was surprised and [Janson] walked away before I asked her any questions. This was the day before Domika was found in a box by the Cincinnati police.

{¶59} Davenport and Daniels stated that the police investigating Domika's death "asked a lot of questions of the men who regularly hung out with [Dudley]." The police interviewed Davenport's husband, and he testified at trial to his and Davenport's concerns, in the weeks preceding Domika's death, about "how she was treated by her mother." Neither the police nor defense counsel spoke with Daniels or Davenport. Nevertheless, Davenport averred, she had gone to the courthouse with her husband, prepared and willing to testify, but "the judge did not let [her]." The trial court's alleged exclusion of Davenport is not reflected in the record.

{¶60} Thereafter, no one on behalf of either law enforcement or Hill spoke to Davenport or Daniels until spring 2011, when they met with an investigator and a lawyer for the federal public defender. Shown a photograph of the box Domika had been found in, Davenport and Daniels both stated that the box in the photo "look[ed] like" the box they had seen Dudley and Janson carrying.

{¶61} *Dr. Martin's affidavit.* Hill also supported his actual-innocence claim with the 2016 affidavit of Dr. Amy Martin, a forensic pathologist who, as deputy coroner, had performed the autopsy on Domika. At trial, Dr. Martin testified that Domika's skull fractures were to "two different areas, so there's impact in both the front of the head and the back of the head, * * * [and thus] more consistent with *

* * two separate impacts or blows." The degree of force necessary to cause those fractures would, in Dr. Martin's opinion, be "considerable." In her opinion, the fractures were not caused by "violent[] shaking" or "a fall from a height of six feet." In her "experience," "fractures like that are caused by very forceful blows, either direct blows to the head" or, because Domika's skull fractures "line up pretty well," "[a]nother possibility could be a crush type injury, where the head of the deceased was crushed between two hard surfaces." Concerning the cause of death, Dr. Martin's opinion, to a reasonable degree of medical certainty, was that Domika had "died as a result of blunt trauma or blunt impacts to the head." Concerning the manner of death, Dr. Martin admitted on cross-examination that she could not determine from the autopsy alone whether Domika had been "intentionally killed." But Domika's death certificate reflected Dr. Martin's opinion that Domika had not been "accidentally killed." And that opinion, Dr. Martin stated, was "[b]ased on all of the other evidence that was available, as well as the circumstances as to how the child was found, the police investigation, all the evidence that was collected, gathering all that and interpreting all that * * *."

{¶62} Dr. Martin's opinion was evaluated in 2010, at the request of the state public defender, by Dr. Dirk G. Wood, and Hill offered Dr. Wood's affidavit in support of his new-trial motion. Dr. Wood criticized Dr. Martin for "dismiss[ing] the possibility that the infant's death was accidental in nature and actually the result of a fall." And he found that Dr. Martin's "contention that the death was intentional [was] not necessarily accurate." In Dr. Wood's opinion, "the lack of any prior physical or sexual abuse indicates an accidental death rather than an intentional homicide," and "the injuries suffered were more likely to be fatal in this case due to the child's apparent underdevelopment."

{¶63} Dr. Martin, in her 2016 affidavit, noted that Domika's autopsy had led her to "certif[y] * * * blunt trauma to the head" as the "cause of death" and to "determine[]" that "homicide" had been "the manner of death." Dr. Martin further summarized her trial testimony:

> I did opine that the injuries could also be consistent with a crush type injury to the infant's head, [and when] asked by defense counsel at that time if an adult falling on a child from a height of nine to ten feet might crush a baby skull, I answered that I was not sure, and would need additional information. This was not pursued further at * * * trial.
>
> I did not testify that Domika * * * was violently shaken.

{¶64} In 2015, at the request of the federal public defender, Dr. Martin reviewed trial testimony and the 1991 autopsy materials, photographs, and report. She also reviewed materials that either had not been available or had not been provided for purposes of her testimony at trial. Those materials included a transcript of the state's closing argument, "photographs * * * of the location * * * where Domika [was] purported to have sustained her injury," "statements that Mr. Hill may have fallen off of a retaining wall and landed directly on top of Domika," and a "small number of relevant" "publications describing clinical presentation and neurological findings in crush injuries to the head in children * * * [that had not been] published at the time of * * * trial." The new materials were attached to her affidavit.

{¶65} Dr. Martin was "dismayed to read the [state's] closing argument * * * that the baby had been 'shaken very violently[,] * * * hard enough to cause brain damage,' " because "these assertions * * * were not an accurate summary of [her] testimony." Her "review of the autopsy materials" did not, she insisted, "change[]

24

[her] opinion as to the cause of death." But her review of that and the additional material altered the conclusions underlying her determination that Domika had not been "accidentally killed," and that "homicide" had been the manner of death:

[B]ased in part on my experience as a forensic pathologist over the past 25 years, as well as the scientific literature now available that discusses more clearly the characteristics of crushing injuries to the head in children, I believe that Domika's head injury is much more consistent with a crush injury to the head th[a]n with inflicted impacts, and certainly more consistent with a crush injury than with injuries seen in shaking or shaking/impact.

In my opinion, Domika's head injury is very consistent with the statements provided to me by Mr. Hill's counsel * * * which suggest that Mr. Hill fell off the retaining wall seen in the photographs while holding the infant, and fell in such a way that his knee crushed Domika's head. The pattern of skull fractures is very consistent with this type of crush injury, and much less consistent with direct blows to the head usually seen in abusive head trauma.

{¶66} *Defense counsel's affidavit.* Finally, Hill submitted with his new-trial motion the 2010 affidavit of his trial counsel. Counsel averred that the police report had not been disclosed to him in discovery, and that if it had, he would have investigated and cross-examined state witnesses about the report's statement that Dudley had run from police and had repeatedly urged the police to look for Domika in the alley.

{¶67} Counsel further averred that the defense had contemplated a strategy beyond inculpating Dudley and impeaching her credibility. The defense's

25

investigation had revealed "evidence indicating that [Domika's] death * * * could have been an accident":

> The back yard of [Dudley's] building * * * was elevated above the street by about eight or nine feet, and it was a straight drop down to the pavement. * * * I thought it was possible that [Hill] could have taken Domika from the residence, and had then accidently fallen over the ledge in the back yard while holding [her]. If [Hill] had landed on Domika after falling eight or nine feet straight down, this could have caused the injuries that resulted in her death.

And the state, before trial, "advised [counsel] that they would be willing to accept a plea agreement * * * to a single count of manslaughter carrying a prison term of ten to twenty-five years * * * [and] result[ing] in [Hill] being ineligible for the death penalty." Counsel urged Hill to accept the agreement; his family persuaded him to reject the agreement.

{¶68} *Standard of review.* The decision whether to grant a Crim.R. 33 motion for a new trial is discretionary and will not be reversed on appeal in the absence of an abuse of that discretion. *See State v. Williams*, 43 Ohio St.2d 88, 330 N.E.2d 891 (1975), paragraph two of the syllabus.

{¶69} Crim.R. 33(A) does not mandate an evidentiary hearing on a motion for a new trial. But the rule plainly contemplates a hearing. *State v. Gaines*, 1st Dist. Hamilton No. C-090097, 2010-Ohio-895, ¶ 4; *State v. Howard*, 1st Dist. Hamilton No. C-850755, 1986 WL 7135, *3 (June 1, 1986).

{¶70} The nature of the hearing on a new-trial motion is discretionary with the court and depends on the circumstances. The court need not conduct a full evidentiary hearing, when the trial record reveals the allegations of the new-trial

motion to be meritless. *State v. Norton*, 1st Dist. Hamilton Nos. C-840415 and C-840896, 1985 WL 8950, *3 (July 24, 1985). The court may decide the motion in a "paper hearing," if the affidavit testimony submitted in support of the motion is deemed by the court to lack credibility, upon consideration of "all relevant factors," including "(1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, * * * (5) whether the affidavits contradict evidence proffered by the defense at trial," (6) whether the affidavits are "contradicted by" the trial testimony of the affiants, and (7) whether the affidavits are "internally inconsistent." *State v. Calhoun*, 86 Ohio St.3d 279, 284-285, 714 N.E.2d 905 (1999). *See Gaines* at ¶ 25-26 (holding that the *Calhoun* factors for assessing the credibility of affidavits submitted in an R.C. 2953.21 postconviction proceeding apply in assessing affidavits and determining the need for an evidentiary hearing on a Crim.R. 33(A)(6) motion for a new trial). But the movant is entitled to an evidentiary hearing, when the motion's allegations are not wholly negated by the trial record, the credibility of the affidavits' averments cannot be wholly discounted, and the motion, on its face, demonstrates substantive grounds for relief. *Gaines* at ¶ 36.

{¶71} ***Brady violation.*** A new trial may be granted under Crim.R. 33(A)(2) on the ground of prosecutorial misconduct. Prosecutorial misconduct in failing to disclose, upon request, evidence "material either to guilt or to punishment" violates the fair-trial guarantee of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215.

This principle extends to wrongfully withheld evidence undermining a witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

{¶72} The materiality of wrongfully withheld evidence must be determined without regard to the good faith or bad faith of the state in withholding the evidence. *Brady* at 87. And the pieces of the evidence must be evaluated "cumulative[ly]," not each piece in isolation. *Wearry*, 136 S.Ct. at 1007, 194 L.Ed.2d 78, quoting *Kyles*, 514 U.S. at 441, 115 S.Ct. 1555, 131 L.Ed.2d 490. To satisfy the materiality requirement, the defendant need not demonstrate that he more likely than not would have been acquitted had the wrongfully withheld evidence been admitted at trial. (Internal quotation marks and brackets omitted.) *Smith v. Cain,* 565 U.S. 73, 75, 132 S.Ct. 627, 181 L.Ed.2d 571 (2012). The requirement is satisfied if the evidence, considered collectively, presents "any reasonable likelihood it could have affected the judgment of the jury." (Internal quotation marks omitted.) *Wearry* at 1006.

{¶73} Hill supported his *Brady* claim with the Cincinnati Police Preliminary Investigation Report and Dudley's grand jury testimony. The police report was wrongly withheld. Hill's demand for discovery gave rise to a duty on the part of the state to provide "reports from peace officers" and "evidence favorable to [Hill] and material to [his] guilt or punishment." Crim.R. 16(B)(5) and (B)(6). The state, in its response to the demand, did not provide the Cincinnati Police Preliminary Investigation Report and claimed to "know[] of no evidence favorable to the defendant." But the police report was from a peace officer, and it contained favorable exculpatory and impeachment evidence.

{¶74} The report shows that behavior and statements on the part of Dudley made the reporting officer reluctant to either eliminate Dudley or label Hill as a

suspect in Domika's disappearance and caused the officer to believe that further inquiry was warranted into Dudley's parenting of Domika and into why she had run from the police and had several times directed the police to check the alley behind the house. The defense could have used the report in cross-examining the officer and Dudley to advance its theory of innocence, by showing that Dudley had, to an objective observer, been as likely a suspect in Domika's disappearance and death as Hill. And the defense could have used the report to undermine the credibility of Dudley, the state's key witness.

{¶75} Thus, the evidence contained in the police report offered in support of the *Brady* claim was not wholly negated by the trial record. The report had been wrongly withheld. And the evidence it contained would have constituted, and could have led to, favorable impeaching or exculpatory evidence that might reasonably be said to have affected the jury's judgment, had it been disclosed to the defense at trial.

{¶76} The same cannot be said for Dudley's grand jury testimony. There is no real inconsistency between her grand jury testimony and her trial testimony concerning the location of the barrette found in Hill's garage. The trial testimony of Pamela Lewis and defense witnesses Denise and Ronessa Hill cleared up any confusion that Dudley's trial testimony might have created concerning who had been present when the barrette was found and thus resolved any arguable inconsistency with her grand jury testimony. Thus, the trial record wholly negates Hill's assertion that Dudley's trial testimony varied materially from her grand jury testimony in those regards.

{¶77} Nevertheless, as supported by the police report, Hill's *Brady* claim, on its face, demonstrated substantive grounds for relief. Accordingly, Hill was entitled to an evidentiary hearing on the claim.

{¶78} *Newly discovered evidence.* Hill also sought a new trial on the ground that the wrongfully withheld police report, along with other newly discovered evidence contained in the affidavits of Davenport, Daniels, and Dr. Martin, demonstrated his actual innocence of aggravated murder. A new trial may be granted under Crim.R. 33(A)(6) on the ground that "new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at trial." Thus, on his Crim.R. 33(A)(6) claim, Hill bore the burden of proving that the evidence is "newly discovered evidence," that is, that it had been "discovered since the trial, [and] could not in the exercise of due diligence have been discovered before the trial." He must also prove that the evidence "is material to the issues, * * * is not merely cumulative to former evidence, and * * * does not merely impeach or contradict the former evidence." And he must prove prejudice. *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶79} When a new trial based on newly discovered evidence is sought on grounds other than a *Brady* violation, the prejudice prong of the analysis demands proof that the newly discovered evidence "discloses a strong probability that it will change the result if a new trial is granted." *Id.* But when a new trial based on newly discovered evidence is sought on the ground of a *Brady* violation, prejudice must be determined under the standard provided for evaluating the materiality of wrongly withheld evidence, that is, whether the evidence presents "any reasonable likelihood it could have affected the judgment of the jury." (Internal quotation marks omitted.) *Wearry*, 136 S.Ct. at 1006, 194 L.Ed.2d 78. *See State v. Carusone*, 1st Dist. Hamilton No. C-140737, 2015-Ohio-4397, ¶ 6-7.

{¶80} Hill was convicted of aggravated murder in violation of R.C. 2903.01, as charged in counts one and two of the indictment: count one charged that he had

purposely caused Domika's death during an aggravated burglary; count two charged that he had purposely caused her death during a kidnapping. *See* R.C. 2903.01. The accompanying specifications charged that he had committed the murders during an aggravated burglary and during a kidnapping.

{¶81} In Hill's direct appeal of his convictions, he challenged the legal sufficiency of the evidence to demonstrate that he had "purposefully killed Domika." *Hill*, 75 Ohio St.3d at 206, 661 N.E.2d 1068. The Supreme Court rejected that argument, concluding that "the jury could reasonably find that Hill purposefully killed Domika," based on Dr. Martin's opinion testimony that the manner of death was "homicide, not accident" and on "Hill's declared intentions" "never to pay child support and to 'kill that little bitch' first." *Id.*

{¶82} But Dr. Martin, in her affidavit, revised her 1991 opinion that the manner of death had been purposeful "homicide, not accident." In her opinion, based on more recent scientific literature, Domika's skull fractures were "much less consistent" with "direct blows to the head usually seen in abusive head trauma" and "very consistent" with a "crush injury" resulting from Hill "[falling] off the retaining wall * * * while holding [Domika] * * * in such a way that his knee crushed her head." And new evidence contained in the police report and in the affidavits of Davenport and Daniels tend to undermine the credibility of Dudley and Janson concerning Hill's "declared intention[]" to kill Domika rather than pay child support.

{¶83} Also, in reviewing Hill's death sentences, the Supreme Court did not discuss the R.C. 2929.04(B)(6) mitigating factor and thus accorded no weight to the degree of Hill's participation in the offenses or in the acts that led to Domika's death. But the police report and the averments of the affidavits of Davenport and Daniels

suggest that Dudley and Janson might instead have been responsible for Domika's death.

{¶84} The Ohio Supreme Court in *Petro* provided the standard for deciding a Crim.R. 33(A)(6) motion for a new trial based on newly discovered evidence. We conclude that common pleas court, in applying that standard, abused its discretion, because the evidence offered in support of Hill's actual-innocence claim demonstrated substantive grounds for relief.

{¶85} The evidence submitted on the actual-innocence claim cannot be said to be other than "newly discovered evidence" for purposes of the *Petro* analysis. *Petro* at syllabus. As we noted, implicit in the common pleas court's grant of leave to file a new-trial motion was the court's determination that Hill had been unavoidably prevented from timely discovering the evidence upon which his newly-discovered-evidence claims depended. And as we determined, the court's unavoidably-prevented determination is, for purposes of this appeal, unassailable, because the state did not cross-appeal. Thus, the court's unavoidably-prevented determination is conclusive on the issue whether, for purposes of the *Petro* analysis, the evidence was "newly discovered," that is, had been "discovered since the trial [and] could not in the exercise of due diligence have been discovered before the trial." *Id.*

{¶86} That evidence is also "material to the issues" of Hill's guilt or innocence of death-eligible aggravated murder and to the credibility of the key witnesses against him. The evidence is not "merely cumulative to," nor does it "merely impeach or contradict" the evidence adduced at trial. *See id.* And the impeachment and exculpatory value of that evidence was such that it might fairly be said to not only present "a reasonable likelihood it could have affected the judgment of the jury," *Wearry*, 136 S.Ct. at 1007, 194 L.Ed.2d 78, but also to "disclose[] a

strong probability that it will change the result if a new trial is granted." *Petro* at syllabus.

{¶87} The common pleas court decided Hill's actual-innocence claim upon his motion and the state's response. We conclude that, consistent with *Calhoun*, the court could not have decided that claim in a "paper hearing." *Calhoun*, 86 Ohio St.3d at 284-285, 714 N.E.2d 905.

{¶88} We note that the affidavits of Davenport and Daniels contain averments to out-of-court statements by Dudley, Janson, and Dudley's mother, Debra Dudley. But the hearsay rule would not have precluded Davenport from testifying at trial that "[Janson] told me that Domika * * * was dead," because the statement would not have been offered for the truth of the matter asserted. *See* Evid.R. 801(C). Also, Dudley's out-of-court statements could have been used to impeach her at trial. *See* Evid.R. 616. And defense counsel could have questioned Debra Dudley concerning her out-of-court statements, both in preparing for trial and by calling her to testify at trial.

{¶89} Otherwise, none of the *Calhoun* factors apply. The material averments of Dr. Martin's affidavit do not rely on hearsay. The judge reviewing the new-trial motion had not presided at Hill's trial. The material averments of Davenport and Daniels were sufficiently distinct from each other that their affidavits did not appear to have been drafted by the same person. Davenport, Daniels, and Dr. Martin were not demonstrably interested in the success of Hill's new-trial motion. Their affidavits were internally consistent, and they supported, rather than contradicted, Hill's defense strategy. And Dr. Martin's affidavit contradicted her trial testimony only to the extent that her trial testimony included her opinion that the manner of Domika's death had been "homicide," while in her affidavit, she allowed for the

possibility that the manner of death had been other than purposeful. *See Calhoun*, 86 Ohio St.3d at 284-285, 714 N.E.2d 905. Therefore, for purposes of determining whether an evidentiary hearing was required, the credibility of the affidavits submitted in support of Hill's actual-innocence claim could not have been discounted, and those averments must be "accepted * * * as true statements of fact." *See Gaines*, 1st Dist. Hamilton No. C-090097, 2010-Ohio-895, at ¶ 35, quoting *Calhoun*, 86 Ohio St.3d at 284-285, 714 N.E.2d 905.

{¶90} We, therefore, conclude that Hill's actual-innocence claim, on its face, demonstrated substantive grounds for relief. Accordingly, we hold that he was entitled to an evidentiary hearing on that claim.

{¶91} *Ineffective assistance of counsel.* Finally, Hill sought a new trial on the ground that he had been denied his Sixth Amendment right to the effective assistance of counsel. His ineffective-counsel claim required proof that counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

{¶92} In support of that claim, Hill offered the affidavits of Davenport and Daniels. And he asserted that counsel, if aware of what either woman had observed or heard, had been constitutionally ineffective in failing to present their testimony at trial. But nothing in the trial record or the evidence offered in support of the claim demonstrates that counsel had been aware of Davenport or Daniels or the testimony that they might have provided. Therefore, counsel cannot be said to have violated a substantial duty in that regard. Accordingly, the common pleas court did not abuse its discretion in denying a new trial on that ground.

### *We Affirm in Part and Reverse and Remand in Part*

{¶93} The common pleas court did not abuse its discretion in denying without an evidentiary hearing Hill's claim in his new-trial motion challenging his trial counsel's effectiveness. Accordingly, we overrule in part the assignment of error and affirm that portion of the court's judgment.

{¶94} But Hill established an entitlement to an evidentiary hearing on the *Brady* and actual-innocence claims advanced in his new-trial motion. The common pleas court's decision to deny relief on those grounds in a "paper hearing," rather than a full evidentiary hearing, was thus not the product of a sound reasoning process. We, therefore, hold that with respect to those claims, the court abused its discretion in overruling the motion without first conducting an evidentiary hearing. *See State v. Hill,* 12 Ohio St.2d 88, 232 N.E.2d 394 (1967), paragraph two of the syllabus (holding that an abuse of discretion is more than an error of law or judgment, but rather implies that the court's attitude was unreasonable, arbitrary, or unconscionable); *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14 (quoting *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990) to define an "unreasonable" decision as one that lacks a sound reasoning process). Accordingly, we sustain the assignment of error in part, reverse the court's judgment overruling the new-trial motion on those grounds, and remand this matter for further proceedings consistent with law and this opinion.

Judgment affirmed in part and reversed in part, and cause remanded.

CUNNINGHAM, P.J., MYERS and DETERS, JJ.

Please note:

The court has recorded its own entry on the date of the release of this opinion.