[Cite as *State v. Long*, 2023-Ohio-132.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220164 |
| | | TRIAL NO. B-0402803 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| JOHN W. LONG, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: January 18, 2023

*Mark Piepmeier*, Interim Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*John W. Long*, pro se.

**MYERS, Presiding Judge**.

{¶1} Defendant-appellant John W. Long appeals the judgment of the Hamilton County Court of Common Pleas denying his Crim.R. 33(A) motion for a new trial based on newly discovered evidence. For the following reasons, we affirm the common pleas court's judgment.

## Factual and Procedural History

{¶2} In 2004, Long was convicted of murder in the August 18, 2003 stabbing death of Amerrintha Spikes. Cincinnati Police Officer Thomas Coombs and his partner, responding to an emergency call from Shelise Gilmore, were directed by Gilmore and Petrina Crawford to a warehouse loading dock, where Spikes was found dead of multiple stab wounds. Gilmore and Crawford told the officer they had seen a man whom they recognized from the neighborhood, running from the loading dock into a nearby alley. In that alley, Officer Coombs spotted a pair of denim shorts. In the pocket of those shorts was a receipt for a bus ticket issued in the name "John Long." The shorts were later collected by another police officer and were submitted to the coroner's office for processing.

{¶3} Forensic analyses of other items found near the crime scene led police to other potential suspects who, after further investigation, were cleared. The name on the bus-ticket receipt led police to initially develop as a suspect a man named John E. Long. The focus turned to the defendant, John W. Long, on December 29, 2003, when Marlonda Garrett told the lead detective that she had purchased the bus ticket for John W. Long, and that Long was then incarcerated in the Hamilton County Justice Center.

{¶4} Thereafter, Crawford identified John W. Long from a photo spread. A police officer assigned that night to assist in securing the crime scene also identified Long as the man who had, at three separate locations, approached the officer and questioned her extensively about the murder. And analyses of biological material

found on the denim shorts confirmed Spikes's blood on the outside of the shorts and a mixture of DNA on the waistband consistent with that of Spikes and Long.

{¶5} Shelise Gilmore was listed as a possible trial witness by the state in its response to Long's discovery request, but she was physically unable to appear. Petrina Crawford testified at trial. She stated that she knew Long from the neighborhood and had seen him that night running from the loading dock and into the alley. She testified that as he was running away, she saw his face when he turned and yelled, "Bitch, you dead already." She stated that Long had been naked, but for the shoes on his feet, and that he had dropped and then picked up a red shirt and something that sounded like metal when it hit the ground. Crawford stated that while she had earlier seen Long wearing dreadlocks, he appeared that night to be bald, possibly because he wore a stocking on his head.

{¶6} Long took the stand in his own defense. He admitted that the denim shorts were his, but he denied killing Spikes. He stated that he had slept on the loading dock for several days before the murder, and that he had left those shorts there four days earlier.

{¶7} The jury found Long guilty of murder. This court affirmed Long's murder conviction in the direct appeal. *See State v. Long*, 1st Dist. Hamilton No. C-0404643 (Oct. 26, 2005), *appeal not accepted*, 108 Ohio St.3d 1489, 2006-Ohio-962, 843 N.E.2d 794; *see also State v. Long*, 1st Dist. Hamilton No. C-100285, 2010-Ohio-6115 (remanding for correction of postrelease control). We also affirmed the denial of postconviction petitions and motions, and DNA-testing applications filed between 2010 and 2019. *See State v. Long*, 1st Dist. Hamilton No. C-120521 (Apr. 24, 2013), *appeal not accepted*, 136 Ohio St.3d 1476, 2013-Ohio-3790, 993 N.E.2d 779; *State v. Long*, 1st Dist. Hamilton Nos. C-130566 and C-130605 (June 13, 2014), *appeal not accepted*, 140 Ohio St.3d 1466, 2014-Ohio-4629, 18 N.E.3d 446; *State v. Long*, 1st Dist. Hamilton No. C-140420 (Mar. 20, 2015); *State v. Long*,

1st Dist. Hamilton No. C-180541, 2019-Ohio-4857, *appeal not accepted*, 158 Ohio St.3d 1436, 2020-Ohio-877, 141 N.E.3d 247.

{¶8} In May 2019, in response to a public-records request, Long received the records in his case from the Cincinnati Police Department and the Hamilton County Coroner's Office. Based on the information he received, he filed a Crim.R. 33(B) motion for leave to file a new-trial motion, a R.C. 2953.23 petition for postconviction relief, and a motion for grand jury testimony. The common pleas court denied both motions and the petition. We affirmed the court's judgment denying the motion for grand jury testimony and the petition, *see State v. Long*, 1st Dist. Hamilton No. C-190566, 2020-Ohio-4557, *appeal not accepted*, 161 Ohio St.3d 1408, 2021-Ohio-106, 161 N.E.3d 695, but reversed the denial of his Crim.R. 33(B) motion for leave to file a new-trial motion, holding that he was unavoidably prevented from discovering the evidence he relied upon to support his new-trial motion. *See State v. Long*, 1st Dist. Hamilton No. C-200240, 2021-Ohio-2835.

{¶9} On remand, Long filed a supplement to his October 2019 proposed new-trial motion. In his new-trial motion, Long sought relief from his murder conviction on the grounds that newly discovered evidence demonstrated (1) prosecutorial misconduct in failing to disclose in discovery material, outcome-determinative evidence, (2) his actual innocence, and (3) ineffective assistance of counsel for failing to investigate potential witnesses' statements and the "DNA record," and failing to ensure the presence of a specific witness at trial.

{¶10} In support of his motion, Long offered the following evidence:

- Cincinnati Police Officer Thomas Coombs's "Police Officer's Notes," in which he had left blank the space for noting any evidence "recover[ed]." Long argued that those "Notes" demonstrated that the officer had perjured himself when he testified at trial that he had found the shorts in a nearby alley;

4

- Statements by Patrina Crawford, the sole eyewitness to testify at trial, showing that she did not identify Long until months after the murder. Long argues that Crawford's statements demonstrate "how [they] * * * evolved over time * * * to fit what the State needed her to say" to secure a conviction. In her August 18, 2003 interview Crawford told police that the male she saw run down the ramp was "bald headed," wearing nothing except gym shoes and carrying a red shirt, which he used to pick something up off the ground. She also said that he had a "funny shaped medium sized head." In her June 12, 2004 statement, she identified Long from a photo array and said he must have been wearing a stocking cap that night because he had looked bald. In her identification, she said that she recognized Long's "funny shaped" ears;

- Eyewitness Shelise Gilmore's November 2003 statement to police, along with the summary of her statement provided in the case's "Investigative Log," when Gilmore had selected John *E.* Long from a photo spread. Long contends that the state withheld impeachment evidence demonstrating that the lead detective had perjured herself when she testified at trial that John *E.* Long had been "developed as a suspect" during the investigation, but that "no one ever selected John E. Long out of a photo array." Gilmore told police that she had "tricked" that night with John E. Long and then introduced him to the victim, and that the picture of John E. Long "looked[] like" the man that she had seen 15 minutes later running from the scene, but who paused to use a red t-shirt to pick up something from the ground. On January 14, 2004, Gilmore told police that the defendant was not in the area the night of the murder. But then shortly after she was

charged with a crime, she started crying and identified the defendant as the suspect she saw fleeing the scene, not John E. Long;

- Crimestopper's report made the day after the murder by a security guard at an apartment building located seven blocks from the crime scene, along with statements to police by the security guard and her boyfriend four months later. The security guard, Brandy Jones, said that at 1:45 a.m., a slim, light-skinned black male in his late 20s, with "short braids," wearing black jeans with a red shirt hanging out of the back pocket and a blood-covered white t-shirt tried to enter the building, claiming he had just killed someone. Jones's boyfriend, Steve Wyatt, provided a similar description but stated that the man was 5'8" or 5'9" with a medium build, weighing 140 pounds. He also stated that the man had blood on his white t-shirt and one of his hands had a lot of blood on it. Four months later, Jones identified Long in a photo array as the man who tried to enter the building with blood on his shirt the night of the murder. Long argues that because there was blood on this man's hand, this suggests that the murderer had cut himself and could have been identified with DNA analysis of blood found at the crime scene;

- Statements made to police by eyewitnesses Gilmore, Ruby Gentry, and Melissa Howell, who gave descriptions to police of the fleeing suspect and were listed as possible witnesses in the state's discovery response but were not called to testify. Gilmore said the fleeing man was 5'4" tall. Gentry stated that she had heard Gilmore arrange for the victim to "trick" with Gilmore's "friend" and heard Gilmore say that her "friend" had killed the victim. Howell described the fleeing suspect as 5'5" tall and skinny. She said that she knew Long, and that the suspect

6

was small and light-skinned like Long, but she could not identify the suspect because his face had been concealed. Their statements, Long asserted, should have directed the investigation away from him;

- The lead detective's "Request for Bank Records, John E. Long III, Murder of Amerrintha Spikes," along with the "Investigative Log," showing the course of her development of John *E.* Long as a suspect. The bank-records request included the detective's statement that Gilmore and Crawford had, that night, described the suspect as "a short, stocky built black man with a light complexion [who] was 'naked' and had a very funny shaped head." The investigative log showed that, four months after the murder, the state was poised to charge John E. Long with the murder. But when Marlonda Garrett told the detective that she had bought the bus ticket for John W. Long, the state turned its attention to him, even though he was not stocky and did not have a funny-shaped head; and,

- The coroner's file, which contained a chain-of-custody report, which Long argues "establishes that an 'electronic DNA record' was created from the blood evidence (specifically blood on the victim's jeans) found at the crime scene and uploaded to CODIS." Long argues that this report shows that the victim's jeans were sent to the coroner's office twice for testing and labeled as "Item 4-5" and as "Item 17." Long states that testing on "Item 17," which he states were the victim's blood-stained pants, resulted in an exclusion result (he and the victim were both excluded as contributors) and thus, the state suppressed exculpatory evidence that "unknown" blood was recovered from the crime scene.

7

**{¶11}** Finally, in his motion, Long sought an evidentiary hearing, but the court summarily denied Long's motion without one.

## Assignment of Error

**{¶12}** Long now appeals, and in a single assignment of error, he contends that "[t]he trial court erred and/or abused its discretion by denying [his] motion for a new trial and this violated [his] 6th and 14th Amendment rights." We are unpersuaded.

**{¶13}** An appellate court typically reviews a common pleas court's decision to grant or deny a motion for a new trial based on newly discovered evidence under an abuse-of-discretion standard. *State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227 (1993). But the Ohio Supreme Court has indicated that a trial court's ruling on a motion for a new trial claiming that the state suppressed evidence favorable to the defendant and material to the issue of guilt, *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), should be reviewed using "a due process analysis rather than an abuse of discretion test because the issue on review concern[s] [the defendant's] due process right to a fair trial, namely the suppression by the prosecution of evidence favorable to [the defendant]." *State v. Johnston*, 39 Ohio St.3d 48, 60, 529 N.E.2d 898 (1988). Therefore, we review de novo a trial court's ruling on a motion for a new trial alleging *Brady* violations, as the relevant inquiry is whether due process was violated by the prosecutor's failure to disclose evidence. *See State v. Moore*, 3d Dist. Union No. 14-08-43, 2009-Ohio-2106, ¶ 19.

**{¶14}** Prosecutorial misconduct in failing to disclose, upon request, evidence "material either to guilt or to punishment" violates the fair-trial guarantee of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Brady* at 87. This principle extends to wrongfully withheld evidence undermining a witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The *Brady* rule applies regardless of whether the evidence is suppressed by the state

willfully or inadvertently. *Strickler v. Greene*, 527 U.S. 263, 280, 199 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

{¶15}  In order to establish a due-process violation under *Brady*, the defendant must demonstrate that: "(1) the prosecution failed to disclose evidence upon request; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *State v. Goney*, 2d Dist. Greene No. 2017-CA-43, 2018-Ohio-2115, ¶ 66.  Evidence is favorable to the accused when it is exculpatory or impeaching.  *State v. McNeal*,  Slip Opinion No. 2022-Ohio-2703, ¶ 20, citing *Strickler* at 281-282.

> "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles [v. Whitley*, 514 U.S. 419,] at 433, [115 S.Ct. 1555, 131 L.Ed.2d. 490 (1995)], quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).  A different result is reasonably probable "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Id.* at 434, quoting *Bagley* at 678.

*McNeal* at ¶ 20.

### Alleged *Brady* Violations

{¶16}  In reviewing Long's alleged *Brady* violations, we keep in mind that, at trial, (1) the only issue in dispute was the identity of the murderer, (2) there was physical evidence connecting Long to the crime scene, namely the victim's blood on his denim shorts found at the crime scene and a bus-ticket receipt in Long's name found in those shorts, and (3) there was testimony from an eyewitness who knew Long from the neighborhood and identified him from a photo array as the man she saw fleeing from the loading dock where the victim was murdered.  We evaluate Long's claimed *Brady*

violations to see if, considering the evidence introduced at trial and in the record before us, whether this new evidence undermines confidence in the outcome of the trial.

{¶17} Officer Coombs's report. With respect to Long's argument that Officer Coombs committed perjury when he testified at trial that he was the one who had found the denim shorts in the alley, we hold that that Police Officer Coombs's report indicating that he "recovered" nothing from the crime scene is not favorable evidence that undermines confidence in the outcome of the trial, and thus, its suppression is not a *Brady* violation. Officer Coombs only testified at trial that he had been the one to spot the denim shorts but had told the jury that a different officer "recovered" the denim shorts and removed them to the police's property room prior to submitting the evidence to the coroner's lab for forensic testing.

{¶18} Patrina Crawford's statements. Next, Long argues that Crawford's statements made to police prior to her identification of Long demonstrate how her testimony changed or evolved over time to "fit what the State needed her to say" in order to secure a conviction. Specifically, Long points to Crawford's August 18, 2003 statement where she described the suspect as having "no hair, baldheaded * * * small head * * * funny shaped head." While this statement is favorable to Long because he is not bald, the jury heard testimony from Crawford that she initially thought the suspect was bald, but then presumed that Long must have been wearing a "stocking cap" the night of the murder. Pictures of Long from roughly the late 1990s to 2003, the year of the murder, show Long with dreadlocks, but the pictures closer to 2003 demonstrate that Long's hair was cut shorter, closer to his head. Because the jury was aware that Crawford initially thought the suspect looked bald, these statements, which are consistent with Crawford's testimony at trial, do not undermine confidence in the outcome of the trial, and the failure to turn over these statements does not constitute a *Brady* violation.

{¶19} Shelise Gilmore's November 2003 statement. Long argues that the lead detective "lied" when she testified no one identified John E. Long from the photo lineup.

He contends that Gilmore identified John E. Long from a photo array as the man she saw fleeing from the loading dock the night Spikes was murdered. In her November 7, 2003 statement to police, which was her second time talking with police, Gilmore said that there were two men standing near her and Crawford on the street corner the night Spikes was murdered. She identified John E. Long from a photo array as one of those men but said she had not known his name at the time. When the detective asked Gilmore if John E. Long "was the same person running from that scene," Gilmore responded, "It was dark but it looked like him." Although this statement is favorable to the defendant, and should have been disclosed to him, when viewed in context with Gilmore's other statements and evidence presented at trial, and the fact that the victim's blood was found on Long's denim shorts at the crime scene, we cannot say that this evidence undermines confidence in the outcome of the trial, and thus, it does not satisfy the materiality component of a due-process violation under *Brady*.

{¶20} Gilmore gave three statements to police. In her first statement, shortly after the murder, she and Crawford were questioned separately but both gave a similar description of the suspect they saw fleeing from the scene. Crawford had a better view of the suspect because she was closer to the loading-dock ramp and Gilmore was across the street on the phone reporting the crime. Notably, Gilmore and Crawford were both shown a photo array within a few days of the murder, which contained a picture of John E. Long, but neither identified John E. Long as the suspect they saw fleeing that night. Gilmore gave her November 2003 statement, her second statement, prior to the police determining that the bus-ticket receipt, found in the pocket of the denim shorts at the crime scene, belonged to defendant. After the investigation began to focus on defendant, Gilmore was stopped by police on an unrelated matter, brought into the station, and shown a photo array, which included a picture of the defendant. At first, Gilmore said she did not recognize anyone but when the officers picked up the array, Gilmore started crying, and identified Long as the person she had seen fleeing that night. After Gilmore

11

identified Long, the lead detective explained to Gilmore that the police could not believe anything Gilmore said because she kept changing her story.

{¶21} Gilmore did not testify at trial because she was incapacitated from a beating. Thus, she did not identify Long at trial. Nor was her pretrial identification of Long admitted into evidence. Thus, the jury did not hear that there was another eyewitness who identified Long.

{¶22} Because she did not testify, Gilmore could not have been cross-examined about her prior identification of John E. Long. Long argues, however, that the lead detective could have been confronted on cross-examination after she testified that no one had identified John E. Long from a photo array. The jury would have also heard that the police had concluded that Gilmore's statements were unreliable and, perhaps, that she had identified Long too.

{¶23} We first note that a fair interpretation of the lead detective's testimony is that no one identified John E. Long from the first photo array. This is true. Neither Crawford nor Gilmore identified him. But beyond that we agree that Gilmore's second identification should have been turned over. As Long points out, it could only have been used to impeach the lead detective. Based on this record, there is no suggestion that Long would have done anything further with respect to investigating John E. Long. His identity, and his identification as a suspect, were known to Long and were covered fully during the trial.

{¶24} Therefore, as noted above, viewing Gilmore's November 2003 statement in context with her other statements, and considering the evidence admitted at trial of Long's guilt, we hold that Gilmore's November 2003 statement, while it should have been disclosed to the defense, ultimately does not constitute a due-process violation under *Brady* because it does not undermine confidence in the outcome of the trial.

{¶25} <u>Statements of Brandy Jones and Steve Wyatt</u>. Long claims that Jones's and her boyfriend Steve Wyatt's statements to police demonstrate that the "bloodied

man" who had tried to enter the apartment building the night of the murder had cut his hand. Long contends that this is evidence that the killer cut himself while stabbing Spikes and left his blood, and thus, the killer's DNA, at the crime scene. Long also argues that this proves the lead detective covered up the fact that "unknown blood" had been found at the crime scene. But upon reviewing Jones's and Wyatt's statements to police, we hold that they are not favorable to Long. First, neither Jones nor Wyatt had seen a cut on the person trying to enter the building. Wyatt only said that the man's hand was bloody. And Jones had told the lead detective that the man's hands had looked yellowish, like bruises or as if his hands had been burned like "somebody who uses crack cocaine." In explaining why she did not call the police after her encounter with this "bloodied man," she stated that she thought the man may have been drunk and maybe had blood on him not because he had just killed someone but because he had cut himself. She did not see any cuts on this person. Also, her description of the "bloodied man"—a man with a slim build and "short braids"—somewhat matches Long's physical appearance. Finally, in her January 14, 2004 statement, Jones viewed a photo array that contained Long's picture, and identified Long as the man who had tried to enter the apartment building that night. Contrary to Long's argument, these statements were not favorable to Long and do not amount to a *Brady* violation.

{¶26} <u>Witness statements of Shelise Gilmore, Ruby Gentry and Melissa Howell</u>. Long claims that these witnesses' statements, which described the fleeing suspect with differing heights, and Gentry's statement, where she said that she had overheard Gilmore say that her friend had killed the victim, should have directed the investigation away from him. But the police did investigate other people at first, including John E. Long, prior to learning that the bus-ticket receipt found in the pocket of the denim shorts, which had the victim's blood on it, belonged to Long. Long has not shown how these statements are relevant to the issue of whether he received a fair trial. It was clear from the evidence admitted at trial that detectives investigated several people prior to focusing their

13

investigation on Long. Further, Ruby Gentry and Gilmore both eventually identified Long as the suspect they saw fleeing the night of the murder. These witnesses' statements are not exculpatory and do not constitute a *Brady* violation.

{¶27} The lead detective's "Request for Bank Records, John E. Long III, Murder of Amerrintha Spikes." The bank-records request included the lead detective's statement that Gilmore and Crawford had described the suspect as "a short, stocky built black man with a light complexion [who] was 'naked' and had a very funny shaped head." Long contends Gilmore and Crawford's description of him should have kept police from considering him as a suspect because he is not stocky, but slim, and does not have a funny shaped head. While the statements could have been used to challenge Crawford's testimony at trial, we cannot say that this evidence undermines confidence in the outcome of the trial where Crawford identified Long as the man she saw fleeing the scene the night of the murder, and where other witnesses, namely Jones and Howell, both described the suspect as "slim" in their statement to police. The state's failure to disclose this evidence to defense does not rise to a *Brady* violation.

{¶28} Coroner's Chain-of-Custody Report. Long argues that the chain-of-custody report demonstrates that the state suppressed exculpatory DNA results—specifically a result that excluded him and the victim as contributors to the blood found on the victim's jeans. He claims that because the report demonstrates that the victim's clothing was submitted to the coroner's office for testing and because the result of that testing was not included on criminalist Joan Burke's fifth laboratory report admitted at trial, which only stated that the victim's blood was found on Long's denim shorts and that Long was excluded as a donor of the semen found in a condom located at the crime scene, then this proves two things: the victim's clothes were tested and an exclusionary DNA test result was suppressed. First, Joan Burke, a forensic examiner with the coroner's office testified that she had tested the victim's clothing for the presence of blood. This is not new evidence. Second, Long's theory that the chain-of-custody report, along with

Brandy Jones's statements, proves that the state suppressed an exculpatory DNA test result is not supported by any evidence in the record and is purely speculative. There was no evidence, as Long claims, that establishes that the murderer had cut himself and left blood at the crime scene. Further, even if Long had been excluded as a contributor to the blood on the victim's pants or other blood recovered at the scene, this does not mean that he is exonerated. Long applied for DNA testing on blood recovered from the crime scene in the past but the common pleas court denied that application, finding that any result would not have been outcome determinative.[1] This court affirmed that judgment. *See Long*, 1st Dist. Hamilton No. C-120521.

{¶29} Long also argues that Burke lied at trial about testing the victim's clothing and about the type of evidence that was labeled as "Item 17" on the chain-of-custody report. The report indicates that Item 17 was the victim's pants. At trial, Burke was questioned about her fifth laboratory report which included testing on items of evidence numbered 16 and 18. When asked what and where was "Item 17," Burke replied that she did not know. She stated that her "best educated guess" was that Item 17 was the defendant's denim shorts because his shorts had been submitted to the coroner's office for testing more than once. But she emphasized at trial that she was just guessing and had no record of Item 17 in her notes. The chain-of-custody report indicating that Item 17 was the victim's pants does not prove that Burke was lying at trial and is simply not exculpatory evidence. The suppression of the chain-of-custody report does not constitute a due-process violation under *Brady*.

### Actual Innocence

{¶30} Long argues that he was entitled to an evidentiary hearing on his motion for a new trial based on his actual-innocence claim because he demonstrated substantive grounds for relief. "Crim.R. 33(A) does not mandate an evidentiary hearing on a motion

---

[1] *See* R.C. 2953.74(C)(3) and (4).

for a new trial." *State v. Hill*, 1st Dist. Hamilton No. C-180114, 2019-Ohio-365, ¶ 69. But a common pleas court may exercise its discretion to hold a hearing. *Id.* at ¶ 70. Long contends that he proved that the blood found on the victim's pants was not his blood and this presents "clear and convincing evidence" in support of his actual innocence. As noted above, there is no evidentiary support for Long's conclusion that the state suppressed an exculpatory DNA test result, and even if he was excluded as a contributor, this result would not be exculpatory in this particular case, given the other evidence at trial establishing his guilt. Long has not demonstrated substantive grounds for relief, and the court did not abuse its discretion in failing to hold a hearing on Long's motion for a new trial.

**Ineffective Assistance of Counsel**

**{¶31}** Long contends that he is entitled to a new trial based on his trial counsel's ineffectiveness by failing to secure Brandy Jones as a witness and failing to investigate "the DNA record" as well as the statements of potential witnesses Wyatt, Gilmore, Gentry, and Howell.

**{¶32}** The decision to grant or deny a motion for a new trial based upon a claim of ineffective assistance of counsel generally lies within the sound discretion of the trial court. That discretion cannot be disturbed on appeal absent a showing that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Hedgecoth*, 1st Dist. Hamilton No. C-020480, 2003-Ohio-3385, ¶ 22. To set aside a conviction and grant a new trial based on ineffective assistance of counsel, a defendant must establish two things. First, the defendant must demonstrate that his trial counsel's performance was deficient. Second, the defendant must demonstrate that the deficient performance resulted in prejudice; specifically, the defendant must establish that there exists a reasonable probability that the outcome of the trial would have been different were it not for his attorney's ineffectiveness. *Id.* at ¶ 23, citing *State v. Bradley*, 42 Ohio St.3d 136,

538 N.E.2d 373 (1989), and *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶33} Here, Long argues that his trial counsel was ineffective in failing to secure Brandy Jones as a witness because an "investigator" spoke with Jones and then sent Long's trial counsel a memo indicating that Jones was a "material witness." But that memo also indicated that Jones described the man who had tried to enter the apartment building the night of the murder as having dreadlocks, which Long had. Further, and more importantly, Jones identified Long from a photo array as the "bloodied" man who was trying to enter the apartment building where she worked. Because Jones would have likely testified consistently with the statements she gave to police and in the memo, we cannot conclude that trial counsel's performance was deficient. But even if it was deficient, Long cannot demonstrate that he was prejudiced by his counsel's failure to secure Jones as a witness. Nor can Long show how his trial counsel's performance in any failing to investigate certain witnesses' statements or "the DNA record" was deficient and/or prejudiced his defense. None of the statements submitted by Long and discussed above with respect to the alleged *Brady* violations, nor the "DNA record," which does not contain an exculpatory DNA-test result, would have changed the outcome of Long's trial. Accordingly, Long cannot demonstrate ineffective assistance of counsel.

### Conclusion

{¶34} Based on the foregoing, we hold that Long has not demonstrated that he is entitled to a new trial based on alleged *Brady* violations, his claim of actual innocence, or his claim for ineffective assistance of counsel. Accordingly, the single assignment of error is overruled, and the judgment of the common pleas court is affirmed.

Judgment affirmed.

ZAYAS and BERGERON, JJ., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.